IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE ) | |
| ) | |
| LEONARD T. REXROAD and ) | 04-43456-H3-13 |
| KIMBERLY ANNE REXROAD, ) | |
| ) | |
| Debtors ) | |
| ) | |

<u>MEMORANDUM OPINION</u>

The court heard the Motion, Amended Motion, and Supplement to Motion To Sell Property of the Estate Free and Clear (Docket Nos. 190, 195, and 201) and the Debtors' Amended Application for Authority to Employ Auctioneer to Sell Property (Docket No. 325) filed by Leonard and Kimberly Rexroad ("Debtors"). After considering the responses, pleadings, evidence, and arguments of counsel, the court makes the following Findings of Fact and Conclusions of Law, and will enter a separate Judgment approving employment of Premier Auctioneers International, Inc. ("Premier") and allowing the sale of certain equipment specified herein. To the extent any of the Findings of Fact herein are construed to be Conclusions of Law, they are hereby adopted as such. To the extent any of the Conclusions of Law herein are construed to be Findings of Fact, they are hereby adopted as such.

<u>Findings of Fact</u>

1.  On September 21, 2004, Leonard T. Rexroad and Kimberly Anne Rexroad ("Debtors"), filed a voluntary bankruptcy

petition under Chapter 13 (Docket No. 1). William E. Heitkamp was appointed the Chapter 13 Trustee. No plan of reorganization has been confirmed and any confirmation will be contested by Rex-Tech.

2. Debtors are third-party defendants in litigation pending in the 55th Judicial District Court of Harris County, Texas in Cause No. 2003-38112, styled "Powertuff Corporation and Powertuff Rig Parts, L.L.C. v. Rex-Tech International, L.L.C. v. Leonard Timothy Rexroad, Individually, Kimberly A. Yeargan a/k/a Kimberly A. Rexroad, Individually, Quality American Rig Parts, L.L.C., David M. Drummond, Individually, James C. Rollings a/k/a Jake Rollings, Indiviually, and Downhole Pipe & Equipment, Inc., and J-Tech International, L.L.C. v. Riva Services, L.L.C., RI Collections, L.L.C. and James E. Petersen, Jr., Individually" ("State Court Litigation"). The State Court Litigation was initiated on July 8, 2003 when Powertuff Corporation and Powertuff Rig Parts, L.L.C. ("Powertuff") sued Rex-Tech International, L.L.C. ("Rex-Tech") to collect on a sworn account. Powertuff Exhibit No. 1.

3. Rex-Tech filed a counterclaim and third-party complaint asserting that the Debtors engaged in a conspiracy to financially ruin Rex-Tech and allow Leonard T. Rexroad to extinguish his obligations under his employment agreement with Rex-Tech. The counterclaim and third-party complaint allege causes of action for breach of duty of good faith and fair dealings, breach of implied covenants and fiduciary duties as well as defamation,

business disparagement, unfair competition, civil conspiracy, constructive fraud, quantum meruit, defalcation/embezzlement, conversion, misappropriation of trade secrets, tortuous interference with a contract, usurpation of business opportunities, violations of deceptive trade practices act, unjust enrichment, alter ego, commercial bribery, misapplication of fiduciary funds and accord and satisfaction.  Powertuff Exhibit No.  2.

    4.    The Debtors then filed a third-party counterclaim against Rex-Tech, James Petersen, Jr. and Riva Services, L.L.C. alleging breach of contract, breach of fiduciary duty, libel, slander, misrepresentation, conversion of personal property, fraud and embezzlement.  Debtors request damages of approximately $1.5 million dollars and punitive and/or exemplary damages of approximately $5 million dollars.  Powertuff Exhibit No.  3.

    5.    Subsequent to the filing of the state court suit, RIVA Services, L.L.C. ("RIVA") foreclosed upon certain assets of Rex-Tech (including its causes of action against the Debtors) pursuant to a secured interest held by RIVA in the property of Rex-Tech.  These causes of action were assigned to R. I. Collections, L.L.C.  Rex-Tech retained its interests in oilfield equipment and assets that are in dispute among the Debtors and James Rollings and Rex-Tech.  Further references to Rex-Tech in this opinion will also include R.I. Collections.

6. Powertuff and Rex-Tech, in separate motions, sought relief from the automatic stay in order to proceed with all aspects of the State Court Litigation. (Docket Nos. 25 and 120). This court granted these motions and lifted the automatic stay to allow Rex-Tech International, L.L.C., R.I. Collections, L.L.C., Powertuff Corporation and Powertuff Rig Parts, L.L.C. to proceed with the State Court litigation to liquidate the claims of the parties. The court prohibited the execution or collection on any judgment rendered against Leonard T. Rexroad and/or Kimberly Anne Rexroad, Debtors, by the 55th Judicial District Court of Harris County, Texas without further order of this court. Docket Nos. 269 and 270).

7. The State Court Litigation will resolve, among other issues, the ownership interest of Rex-Tech in equipment that the Debtors have claimed and listed as assets in their bankruptcy proceeding. Rex-Tech, through counsel, advised the court in July 2006 that trial of the State Court Litigation was expected to begin in October 2006. Counsel suggested the trial was expected to last for months.

8. Debtors seek authorization to employ Premier to sell the equipment listed on Exhibits "A" and "B" (hereafter referred to as "equipment") attached to their Amended Application for Authority to Employ Auctioneer to Sell Property (Docket No. 325). Debtors also request that the court authorize Premier to access the

4

equipment which is located at the premises of Rex-Tech and Downhole Pipe & Equipment, Inc. ("Downhole").  All proceeds are to be deposited in the registry of the United States District Court, Southern District of Texas, until resolution of the State Court Litigation and thereafter, distributions are to be made in accordance with the findings of ownership by the state court.

9. Rex-Tech opposes the employment of an auctioneer and the sale of the equipment on the following bases: that ownership of the items should first be determined by the State Court Litigation; that conducting such a sale would be disruptive to Rex-Tech's business and the businesses of the other companies that operate on Rex-Tech's premises; that an auction will diminish the value of the equipment; and that it would be difficult to prorate auction proceeds in accordance with each item.  Rex-Tech proposes that the equipment at the premises of Downhole be moved to Rex-Tech's premises, to be stored rent free until the State Court Litigation is concluded and ownership determined.

10. Upon resolution of the State Court Litigation which Rex-Tech hopes to win, Rex-Tech plans to sell the entirety of the equipment as a package.  It believes this will generate higher proceeds than a sale by auction where the equipment is sold by the piece.  Rex-Tech asserts that one prospective buyer of the equipment is American Block, an oilfield equipment refurbishment business operating from Rex-Tech's old space.

11. The proposed Auction Agreement provides that Premier is to receive a commission of eight percent (8%) of the gross proceeds of the sale. Advertising and promotional expenses are included in the commission, as are yard rental fees, security, checkout personnel (with utilities and telephones), and auction location. Debtors are responsible for the costs of any pre-approved "...third-party services (prep, load, unload, repair, etc.)incurred by PREMIER, plus ten percent (10%)." Distribution of proceeds shall be in the following order: expenses of sale; third-party services not paid by Debtors; Premier's commission; payment to lien holders, and the balance to Debtors. Debtors' Exhibit No. 7.

12. Donna Haggard, the General Manager of Premier, testified that Premier was established in March 1997 and she has been involved with the company for 25 years. Premier is considered a top ranked, world class auctioneer. It conducts eighteen to twenty-five auctions per year in connection with the energy industry, specifically including sales of oilfield equipment. Premier has a world wide client base and promotes its auctions through advertising in local and area newspapers, and in issues of Tradequip, Oiltizer, and The Leader publications. Premier also conducts email and fax campaigns, reaching 20,000 to 30,000 recipients, as well as maintaining auction updates on its website. Ms. Haggard also credibly testified that the auction could be

conducted on the Rex-Tech premises without disruption to Rex-Tech's business. She estimated that there would be approximately 150 to 300 potential bidders going through Rex-Tech's yard. Alternatively, the equipment could be moved and the auction conducted elsewhere.

13. Larry Rodgers, the Sales Manager and Equipment Specialist for Premier, has been with Premier since 1989. He testified that he has worked on rigs for a total of 30 years. In November 2005 Rodgers went to Rex-Tech's premises and inspected approximately 85% of the equipment to be sold. He was shown the equipment by an individual who was in the offices of American Block. Rodgers spent a couple of hours viewing the equipment and estimated that a sale of the equipment at auction would produce between $500,000 to $600,000. He testified that a majority of the equipment was outside in one area of the yard, with other pieces located in one warehouse. According to Rodgers, some of the larger pieces of equipment appeared to have been cannibalized but other pieces appeared to be serviceable once needed repairs were made.

14. Rodgers credibly testified that, presently, oilfield equipment is in high demand and in short supply. He explained that the manufacture of new equipment has not yet caught up with the current demand. However, he testified that there was no guarantee that this favorable market for the equipment would continue, especially in light of the fact that the Chinese had recently

completed a manufacturing center. Rodgers testified that it would be preferable to conduct the auction on site as this would yield more money.

15. Mr. William Webster of Webster's Auction Palace ("Webster's") testified on behalf of Rex-Tech. Webster has been in the auction business since 1979 and is an approved auctioneer for the Southern District of Texas. Mr. Webster testified that of the approximately forty to sixty auctions conducted each year at Webster's, only three or four of them are for oilfield equipment. He further testified that Webster's has between fifty and three hundred oilfield buyers on their list of potential bidders.

16. In mid July 2006, Webster went to Rex-Tech's premises and inspected equipment that was pointed out to him on an inventory. He did not inspect any of the equipment located on Downhole's premises. From a comparison of the inventory provided to him and the list of equipment attached to the sale motion, Webster testified that it appeared that not all the equipment was being sold and if so, this would not be efficient. He testified that he believed the equipment he inspected was adequately stored and would not depreciate in three to five months. Mr. Webster testified that he valued the equipment at approximately $300,000. Mr. Webster testified that he believed a private sale of all of the equipment in bulk from a single location would generate the most money.

17. Rex-Tech requests a delay in the sale of the equipment until the conclusion of the State Court Litigation. Based upon the information available to this court, Rex-Tech and Debtors have been involved in a contentious dispute with each other for over three years, beginning at least from the time of Tim Rexroad's termination of employment in June 2003. Regardless, this court notes that in the State Court Litigation[1] and this bankruptcy court, Rex-Tech has pursued this dispute in a continuously aggressive and multi-front manner. There is a considerable probability that the State Court Litigation will continue long after the initial findings have been made by the state court. The court notes that the appellate process can extend this litigation for another four or five years.

18. There is conflicting testimony as to whether most of the equipment is being stored inside the warehouse or outside in the yard. However, it is clear that some of the equipment is being stored outside, making it susceptible to deterioration. In addition, the evidence before the court is that the current market for the sale of oilfield equipment is good. There is no guarantee

---

[1] Pleadings from the State Court Litigation have been submitted to this court as exhibits to motions filed in this bankruptcy court or introduced as evidence on hearings held by this court. See Main Case, Hearings on Motion For Relief from Stay held on May 11, 2005, June 7, 2005, and July 19, 2005. See Main Case, Supplemental Documents by Order of Court, Docket No. 301 and Notice to Court of Action Taken in State Court Litigation, Docket No. 315. See Adversary No. 05-3023, Hearings on Temporary Restraining Order and Preliminary Injunction held January, 11, 2005, January 14, 2005, and January 31, 2005. See Adversary No. 05-3027, Second Motion for Temporary Restraining Order, Docket No. 15 and Exhibit List attached to Pretrial Statement, Docket No. 50.

that this favorable market will continue. Further, both parties ultimately want the property sold. The court finds that an immediate sale of the equipment with each parties' interest to attach to the proceeds is in the best interests of the estate.

19.  The court finds that both Premier and Webster's are qualified auctioneers but that Premier has had more experience conducting auctions involving oilfield equipment and has a more extensive client base. Both Premier and Webster's agreed that a bulk sale would likely result in more revenue. The parties cannot agree on apportionment of the proceeds of a bulk sale. The state court's determination of ownership will dictate the subsequent distribution of the proceeds.

20.  The court finds that the auction should be conducted in a manner whereby the funds generated from the auction can be separately attributed to each piece of equipment sold. Unless the parties can agree otherwise, the auction is to be held on a neutral site with any costs incurred for moving the equipment to be deducted from the auction proceeds as an expense of the sale.

21.  Some of the equipment may need refurbishing to bring the best possible price. Rex-Tech opposes any refurbishment due to a lack of specificity as to the procedural mechanism for doing so. The court finds it would be more beneficial for the equipment to be in its best possible condition prior to sale in order to increase sale proceeds. In the event that Premier recommends refurbishment

to be performed on a piece of equipment, the parties are to agree whether it would be cost effective to do so (i.e., considering the type of refurbishment required, time involved for completion of any refurbishment, the cost of same and the anticipated increase in sale proceeds from the equipment refurbished as compared to not being refurbished). In the event the parties can not agree, the equipment is to be sold as is.

<u>Conclusions of Law</u>

1. Section 363(f) permits a sale of property of the estate free and clear of an interest in the property. It has long been recognized that the bankruptcy court has the power to authorize the sale of property free of an interest in the property with the interest attaching to the proceeds, without the consent of the interest holder. The trustee (debtor in possession or chapter 13 debtor) may sell property free and clear when applicable nonbankruptcy law permits such a sale, the third party consents, its interest is a lien and the price for the property exceeds that value of all liens on the property, the interest is in bona fide dispute, or the entity could be compelled in a legal or equitable proceeding to accept money satisfaction of its interest. Sale free of the interest can occur if any one of the conditions of section 363(f) has been met.

2. A sale may proceed free and clear of liens or an interest if they are in bona fide dispute. 11 U.S.C. § 363(f)(4).

The trustee has the burden of demonstrating that a bona fide dispute exists. In some situation it may be a third party that raises the issue of bona fide dispute. *See In re Gerwer*, 898 F.2d 730 (9th Cir. 1990); *Scherer v. Federal Nat'l Mortgage Ass'n*, 159 B.R. 821 (N.D. Ill. 1991). To meet this burden the trustee must establish that there is an objective basis for either a factual or legal dispute as to the validity of the debt. The court is not required to resolve the underlying dispute, but must determine that it exists. *See In re Octagon Roofing*, 123 B.R. 583 (Bankr. N.D. Ill. 1991); *In re Collins*, 180 B.R. 447 (Bankr. N.D. Va. 1995).

       3.   Rex-Tech cites *Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603 (9th Cir. 2004) for the proposition that a bona fide dispute over the validity of the nondebtor party's interest in the property and a dispute over the debtor's interest are distinguishable, and in the latter case, the court may not authorize a sale until the court resolves the dispute. This opinion was subsequently withdrawn by the Ninth Circuit Court of Appeals. *See In re Rodeo Canon Development Corp.*, 126 Fed.Appx. 353, 05 Cal. Daily Op. Serv. 2057 (9th Cir. March 08, 2005)(Not selected for publication in the Federal Reporter), 2005 U.S. App. LEXIS 3786 (9th Cir. Mar. 8, 2005).

      Based on the foregoing, the court will enter a separate Judgment granting Debtors' "Motion, Amended Motion, and Supplement to Motion To Sell Property of the Estate Free and Clear" (Docket

Nos. 190, 195, and 201) and the "Debtors' Amended Application for Authority to Employ Auctioneer to Sell Property" (Docket No. 325) filed by Leonard and Kimberly Rexroad.

Due to the litigious history of this case, the following detailed and specific time tables are established. The parties are required to designate a mutually agreed upon auction site. In the event that no agreement can be reached, Premier is to designate a neutral site. Debtors are to file a Notice of Site Designation with the court within 15 days from the date of entry of this order. In the event that Premier recommends refurbishment to be performed on a piece of equipment, the parties are to agree whether it would be cost effective to do so. If the parties are unable to agree, the equipment is to be sold as is.

Premier is to hold the auction as soon as possible and is to begin marketing and advertising the equipment no later than 30 days from the date of entry of this order. Premier may access the equipment immediately, wherever located, including the premises of Rex-Tech and Downhole, to prepare for, conduct and complete the auction. No party, person or entity shall interfere with preparations for the auction, the auction itself, or the removal of property by winning bidders.

SIGNED at Houston, Texas on this 22nd day of September, 2006.

_____
LETITIA Z. CLARK
UNITED STATES BANKRUPTCY JUDGE